Nebraska Telephone Co. v. City of Fremont.

REVERSED.

---

NEBRASKA TELEPHONE COMPANY, APPELLEE, v. CITY OF FREMONT ET AL., APPELLANTS.

FILED MAY 18, 1904.   No. 13,590.

1. Cities: USE OF STREETS BY PUBLIC SERVICE CORPORATIONS. When a city ordinance prescribes that permission to occupy the streets by a public service corporation shall be obtained with the consent of the mayor and council, such consent is sufficiently proved by an entry in the records of a meeting of the council presided over by the mayor, reciting that a motion granting it was offered by a member and adopted, there being nothing to indicate that the mayor dissented.

2. ——: ——: FORFEITURE. Forfeiture of the franchises and easements of a public service corporation in the streets can be declared and enforced only by a court of competent jurisdiction. The city claiming a forfeiture cannot be a judge in its own cause, or invade the privileges, or destroy the property of such a corporation, in the absence of judicial warrant for so doing.

APPEAL from the district court for Dodge county: CONRAD HOLLENBECK, JUDGE. *Affirmed.*

*Gray & Abbott,* for appellants.

*W. W. Morsman* and *Frank Dolezal, contra.*

AMES, C.

In 1881, J. J. Dickey, L. H. Korty and W. J. Bigger united in an association, not incorporated, and named by them the Fremont Telephone Company. By that name

they applied to the mayor and council of the city of Fremont in session, on the 17th day of December, in that year, for permission to construct and maintain a system of poles, wires and apparatus constituting a telephone exchange, through and over the streets, avenues and alleys of the city. Having heard the application, the body instructed the city attorney to prepare an ordinance suitable to accomplish the desired purpose, and adjourned until the 19th of the month. At an adjourned meeting, held accordingly, an ordinance was duly enacted, and the following entry appears on the record of the proceedings: "On motion of Murray, a permit was granted to the Fremont Telephone Company to erect their poles and wires thereon, subject to ordinance number 77," the measure just adopted. Of sections one and two of the ordinance, which was unanimously adopted, the following is a copy:

"Section 1. That any person, company or corporation, is hereby authorized to erect poles and wires on the streets of the city of Fremont for the purpose of erecting and maintaining any telephone, telephones, telegraph or telegraphs, upon obtaining the consent of the mayor and council of said city to such use of the streets; provided, that such poles and wires be so erected as to in no manner interfere with the public use of the streets and sidewalks of said city; and provided further, that the erection of such poles and wires shall always be under the supervision and control of the committee on streets and sidewalks of said city; and provided further, that the location and height of any pole or wire may at any time be changed by the council.

"Section 2. The consent of the mayor and council, provided for in the first section of this ordinance, may be given at any regular or special meeting of the council, and shall be entered upon the minutes, and such consent shall authorize the use of the streets of said city for the erection of telephone or telegraph lines, subject to such regulations as have been or may be provided by ordinance; provided that in all cases where any person is

desirous of moving any building or buildings through the streets of said city, any party owning or controlling said wires shall, after having twenty-four hours notice, raise up said wires enough to enable the ready and free movement of such buildings."

There is no question as to the authority of the city to grant the license or privilege, as by these proceedings it purported to do.  Shortly afterwards the association accepted the grant, and constructed an exchange, occupying some of the streets and alleys for that purpose, and they maintained the system thereafter for the service of the citizens continuously until December, 1882, when they surrendered possession of it to the plaintiff, a corporation, in consideration of the receipt in exchange therefor of $3,600, in par amount of its capital stock, estimated to be of that value.  At that time the number of patrons of the exchange was a few score, but the plaintiff, after obtaining possession, continued in the enjoyment of it uninterruptedly and without protest until shortly before the beginning of this action in January, 1903, or for a period of 20 years.  During that time it reconstructed the entire system, extending it over additional areas and increasing the number of its patrons by nearly 400.  Throughout this interval, its right so to do seems never to have been questioned, and its relations with the city authorities appear to have been friendly.  In so doing, the company, with the knowledge and acquiescence of the city, expended large sums of money, so that the system is now concededly of the value of $25,000.  It contracted with the plaintiff concerning the location of electric light wires, maintained by the city, so as to avoid interferences, and paid it an agreed compensation for the use of its poles for the support of wires for its fire alarm system, and continuously, from and after 1890, the city levied against and collected from it an annual occupation tax.

In December, 1902, the mayor and council adopted a resolution purporting to forbid the erection by the plaintiff of poles and wires on any part of the streets, avenues

and alleys of the city not already so in use, and to prohibit it from replacing such structures in the public ways theretofore so occupied, when by decay or usage they should become deteriorated and unfit for the transaction of the business of the exchange. Notwithstanding this prohibition, the company did erect some poles and put up some wires which the city authorities, pursuant to this resolution, caused to be cut down and destroyed, and this action was begun to restrain them from the repetition of such conduct. A temporary injunction was granted, which by final decree was made perpetual, and the city appealed to this court.

It is first contended that no valid permission was granted to the association for the construction of the system in the first instance, because the ordinance enacts that such privilege shall be granted, if at all, by the mayor and council, and the entry upon the record of the proceedings of the meeting of the council does not recite that the mayor consented thereto. But it is recited that he was present and presided at the meeting, and he presumably announced the adoption of the resolution without objection, nothing in the record indicating the contrary. The mayor and council, when in session, constitute a single collective and deliberative body, and we think that his assent to the motion is a fair inference from the entry in the minutes.

It is next contended that, even if the proceedings were sufficiently formal and complete, they amounted to a grant to the members of the association personally, and not to their successors or assigns, of a franchise having the character of an easement in, over and upon the streets, avenues and alleys of the city, and that such an easement is real property, an estate in land, which can be alienated only with the consent of the public, expressed through the legislature, and then only by means of an instrument in writing executed in conformity to the provisions of the statute relative to the conveyance of land. And it is urged that no such consent has been shown, and no such instru-

ment has been produced, and that therefore the plaintiff is a mere trespasser upon the streets, and its poles and wires unlawful obstructions and nuisances, which it is not only the right but the duty of the city authorities to remove therefrom. Granting, for the sake of discussion, the defendant's premises, we do not think that its conclusion follows therefrom. By the terms of the ordinance, there was a grant to the association, in perpetuity, of a right of way or easement over all its public ways, without restriction or limitation. It was subject to certain conditions and regulations as to the manner of user, which are not in controversy here, and which we have not thought it necessary to set forth, and it was and is, doubtless, forfeitable for unspecified acts of abuse, abandonment and nonuser, and it may be conceded that another person or corporation cannot be legally substituted in its stead without the consent or acquiescence of the public, but if such consent had been given, the manner of the transfer would be a matter in which the public would have no interest. It is not a matter of public concern whether A conveys his land to B by deed or by livery, or whether the former permits the latter to enter and acquire the estate by adverse possession, without color of title or consent. With all that neither the public nor the grantor of A has any concern. As respects this phase of the controversy, the city stands in the attitude of A's grantor. The latter may recover possession from B if A has incurred forfeiture by breach of a valid covenant against alienation, but he cannot complain that an attempted alienation was ineffectual or void between the parties to it. Such contention, if upheld, would defeat his claim for forfeiture. For the same reasons the city cannot complain that, as between the association and the plaintiff, the attempted transfer from the former to the latter was lacking in essential formalities. Statutes and legal rules relative to the forms and instruments requisite for the creation and transfer of estates and interests in real property were made for the regulation, exclusively, of the rights and obligations of the parties to

such transactions, and of persons claiming through or under them. In this instance, the city claims adversely to both parties, the association and the plaintiff. But it is conceded by both that the plaintiff is, and for 20 years past has been, with the consent of the association, in the peaceable possession of the franchises and easements granted by the city to the latter. And that concession, we think, precludes, in this action, any necessity for an inquiry into the manner in which that possession was acquired. Let it then be assumed, but without deciding —for, in our opinion, the question is not now before the court for decision—that the transfer from the association to the plaintiff was in violation of public law, that it was an abandonment by the former, followed by nonuser of such character that it incurred thereby liability to forfeiture of its grant. Has the plaintiff, by reason of the premises, become a trespasser upon the streets of the city and its property subject to spoliation by the city authorities or by the first comer? We have been cited to no judicial decision to that effect, and are quite confident that none can be found. By hypothesis, the city made a valid grant of a valuable estate in lands and put its grantee into possession. By some means—no matter what or how—the plaintiff, to use a common law expression, became seized of that estate. The city claims that the fact and manner of its grantee's disseizin has worked a forfeiture of the estate. Can the city sit in judgment on its own cause, and execute the judgment without more ado? We think not. A city, like an individual, can recover that which it has conveyed away, only by a voluntary reconveyance or surrender, or by the judgment of a court of competent jurisdiction. The declaration and enforcement of a forfeiture are judicial acts which can be performed neither by a municipal council nor by the legislature. This is so familiar a proposition of law that little or no authority need be cited in its support, though the books are full of it. Thus says Beach on Private Corporations, vol. 1, sec. 45:

"It is conceded that a corporation may forfeit its charter or franchises for wilful misuser or nonuser thereof. For it is a tacit condition, annexed to the creation of every corporation, that it shall be subject to dissolution by forfeiture of its franchise for wilful misuser or nonuser in regard to matters which go to the essence of the contract between it and the state; and a proceeding upon an information in the nature of *quo warranto,* filed by the attorney general on behalf of the state, is the proper mode of trying the issue. The power of the courts in this respect is exclusive. The forfeiture of corporate charters is a penalty to be imposed by the judiciary alone. Under no circumstances can the legislature presume to declare a forfeiture. Such an usurpation of judicial powers would be hostile to one of the fundamental principles of the American system, by which the legislative, executive and judicial departments of government are required to be forever separate, and would be a denial of due process of law. For 'in these cases there are necessarily adverse parties; the questions that would arise are essentially judicial; and over them the court possesses jurisdiction at the common law; and it is presumable that legislative acts of this character must have been adopted carelessly, and without due consideration of the proper boundaries which mark the separation of legislative from judicial duties.' It follows, as a matter of course, that the legislature cannot strengthen an enactment of forfeiture by reciting therein facts which would constitute a ground for a judicial declaration of forfeiture." See also cases cited in notes.

The Fremont telephone system is not an unlawful structure but a public work of great utility. The plaintiff, if in unlawful possession, to the detriment of the public, may be ousted by appropriate judicial proceedings, but private rights and public interests alike forbid wanton destruction of the property.

It is recommended that the judgment of the district court be affirmed.

LETTON and OLDHAM, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, it is ordered that the judgment of the district court be

AFFIRMED.